# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____

|  |  |
|---|---|
| ELECTRONIC PRIVACY | ) |
| INFORMATION CENTER, | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) Civil Action No: 12-cv-00127 (BJR) |
|  | ) |
| U.S. DEPARTMENT OF JUSTICE | ) |
| CRIMINAL DIVISION, et al., | ) |
|  | ) |
| Defendants. | ) |

_____)

## PLAINTIFF'S COMBINED REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF MOTION FOR *IN CAMERA* EXAMINATION

Plaintiff Electronic Privacy Information Center ("EPIC") respectfully submits this reply in support of its cross-motion for summary judgment and in support of its motion for *in camera* review.

Respectfully submitted,

By:    _/s/_____
Marc Rotenberg (DC Bar # 422825)
Ginger McCall (DC Bar # 1001104)
David Jacobs[*]
ELECTRONIC PRIVACY
INFORMATION CENTER
1718 Connecticut Avenue, N.W.
Suite 200
Washington, D.C. 20009
(202) 483-1140 (telephone)
(202) 483-1248 (facsimile)

Dated:  April 24, 2013

_____

[*] Mr. Jacobs is a member in good standing of the New York bar whose admission to the D.C. bar is pending.

## <u>TABLE OF CONTENTS</u>

Introduction ............................................................................................................................2

Argument ...............................................................................................................................2

    I.    The First Subset of Records Concerns Documents for which No Proper Law
Enforcement Purpose Exists and Therefore Must be Released ...........................................3

    A.    EPIC has Supported its Claim as to the Existence of the First Subset of
Records ................................................................................................................................3

    B.    Records About Lawful, First Amendment-Protected Activities were
Compiled for Improper Law Enforcement Purposes ..........................................................9

    II.    The Third Subset of Responsive Records Contains Documents that Must be
Released ..............................................................................................................................13

    A.    Publicly Revealed Information Regarding the Targeting of Twitter
Subscribers Must be Disclosed ..........................................................................................13

    B.    The Government Has Failed to Segregate and Release Non-Exempt Portions
of Records ...........................................................................................................................15

    III.    The Government Conducted an Inadequate Search for Responsive Records ..........17

    IV.    The Court Should Conduct an *In Camera* Review to Resolve Substantial
Questions Regarding the Content of the Withheld Records ...............................................18

Conclusion ...........................................................................................................................20

## INTRODUCTION

This case arises from three FOIA requests filed by EPIC that sought information regarding the targeting of individuals who have supported or expressed interest in WikiLeaks, an Internet-based media organization. The core of these requests concerns law enforcement records that were created about lawful conduct protected by the First Amendment. After confirming the existence of responsive records, the government has withheld all records in their entirety, refused to provide basic information about the volume of responsive records withheld, refused to produce a sufficiently detailed justification for the exemptions claimed, and kept secret the identities of one or more statutes that allegedly justify its withholding.

Contrary to the agency's assertions, EPIC has never claimed that all, or even most, of the responsive records are nonexempt, and as a result the government spends much of its brief arguing against a nonexistent position. But EPIC does contend that a subset of the responsive records was compiled for an improper law enforcement purpose: the constitutionally protected speech, advocacy, and associational activities engaged in by individuals. The exemptions set out in the FOIA provide no protection against the disclosure of these records. Another subset of responsive records must also be released because, despite being compiled for a proper purpose, it contains information that is segregable or has already been publicly disclosed.

## ARGUMENT

Although much information regarding the volume and content of responsive records has been poorly conveyed by the government or withheld in its entirety, the issues in this case may be clarified by grouping the responsive records into three general subsets: (1) records concerning the targeting of individuals whose only connection to WikiLeaks or to the disclosure of classified

documents occurred through lawful activities protected by the First Amendment; (2) records that concern the investigation of individuals suspected of disclosing classified information and are wholly exempt; and (3) records that, although compiled for a proper law enforcement purpose, are not wholly exempt because they contain content that is either segregable or has been previously disclosed to the public. The first subset of records must be disclosed because it was compiled for an improper law enforcement purpose. The third subset of records must be disclosed because it consists of segregable or publicly revealed portions of otherwise properly exempt documents. Significantly, EPIC has no objection to withholding of the second category of records.

EPIC makes three additional arguments. First, the government has failed to conduct a sufficient search. Second, the government's reliance on secret statutes to support its Exemption 3 withholdings is illegitimate.[1] And finally, at a minimum, the Court should review the withheld records *in camera.*

## I. The First Subset of Records Concerns Documents for which No Proper Law Enforcement Purpose Exists and Therefore Must be Released

### A. EPIC has Supported its Claim as to the Existence of the First Subset of Records

The first subset of records consists of information about the government's surveillance or targeting of individuals who engaged in First Amendment-protected activity regarding WikiLeaks, such as viewing documents published by WikiLeaks, donating money to WikiLeaks, supporting those who provide information to WikiLeaks, supporting WikiLeaks itself, or otherwise associating themselves with WikiLeaks. As stated in EPIC's opposition and cross-

---

[1] EPIC's arguments regarding this point are set forth in its opposition to the government's motion for leave to file *ex parte* and *in camera* declarations. *See* Pl.'s Opp. to Defs.' Mot. for Leave, Dkt. 13.

motion, the first category concerns information about "the targeting of individuals engaged in lawful First Amendment activities for which no legitimate law enforcement purpose exists." Pl.'s Opp'n/Cross-Mot. Summ. J., Dkt. 15, at 1; *see also id.* at 10-14 (describing the constitutionally protected activities that prompted the FOIA request).

The government begins with the incredible claim that EPIC's FOIA requests did not, in fact, request such information. *See* Defs. Reply/Opp'n., Dkt. 21, at 4 ("EPIC's brief is replete with references to a FOIA request far different than the requests that were actually submitted to Defendants."); *id.* ("The terms of the request say nothing about First Amendment activities or Constitutional rights."). Even a cursory examination of EPIC's FOIA requests shows this claim to be false. EPIC's FOIA requests describe the targeting of Jacob Appelbaum, who represented WikiLeaks at a conference in New York City in 2010, and was subsequently questioned by FBI agents and detained repeatedly at the U.S. border, during which he was questioned and had his electronic devices seized. *See* Hardy Decl., Dkt. 12-2, Ex. A, at 60 (EPIC's request to FBI); Bradley Decl., Dkt. 12-3, Ex. 1, at 20 (EPIC's request to NSD); Cunningham Decl., Dkt. 12-4, Ex. 1, at 24 (EPIC's request to CRM). EPIC's FOIA requests stated that "[a]ll of the questioning by FBI and DHS focused on his personal views on and work with WikiLeaks." Hardy Decl., Dkt. 12-2, Ex. A, at 60; Bradley Decl., Dkt. 12-3, Ex. 1, at 20; Cunningham Decl., Dkt. 12-4, Ex. 1, at 24. EPIC's FOIA requests also described the detention and questioning by FBI and CPB agents of David House, the creator of a support network for Bradley Manning, one of WikiLeaks' principal sources. Hardy Decl., Dkt. 12-2, Ex. A, at 60-61; Bradley Decl., Dkt. 12-3, Ex. 1, at 21; Cunningham Decl., Dkt. 12-4, Ex. 1, at 25. These events were cited as examples of the types of documents EPIC sought: records regarding individuals targeted because of their "support for or

interest in WikiLeaks."[2] Compl., Dkt. 1, ¶ 33.

To be sure, the terms of EPIC's request are broad enough to sweep in properly exempt material, and EPIC has never contended otherwise. *See* Pl.'s Opp'n/Cross-Mot. Summ. J., Dkt. 15, at 11 ("EPIC accepts that a portion of the responsive records relate to legitimate law enforcement investigations."). But an agency that fulfills its obligation to construe FOIA requests "liberally in favor of disclosure" *LaCedra v. Executive Office for U.S. Attorneys*, 317 F.3d 345, 348 (D.C. Cir. 2003), would recognize that EPIC's requests concerned constitutionally protected activities. The presence of the magic words the government apparently desires—"First Amendment activities or Constitutional rights," Defs.' Reply/Opp'n., Dkt. 21, at 4—is unnecessary.

Next, the government argues that the existence of the first subset of records is "wholly unsupported." Defs. Reply/Opp'n., Dkt. 21, at 9; *see also id.* at 6 (referring to "EPIC's unsupported assumption about the focus of an investigation with which it lacks familiarity."). This is false. The truth is that EPIC's claim is as well-supported as possible under the circumstances. As described above, EPIC's FOIA requests supported the inference as to the targeting based on First Amendment activity with several specific events, including the cases of Jacob Appelbaum and David House. Hardy Decl., Dkt. 12-2, Ex. A, at 60-61; Bradley Decl., Dkt. 12-3, Ex. 1, at 20-21; Cunningham Decl., Dkt. 12-4, Ex. 1, at 24-25.

The existence of these records is also supported by publicly available court documents. In

---

[2] EPIC sought additional documents as well, including "records regarding lists of names of individuals who have demonstrated support for or interest in WikiLeaks"; communications with Internet and social media companies regarding "regarding lists of individuals who have demonstrated, through advocacy or other means, support for or interest in WikiLeaks"; and communications with financial services companies regarding "individuals who have demonstrated, through monetary donations or other means, support or interest in WikiLeaks." Compl., Dkt. 1, ¶ 33.

*In re Application of the U.S. for an Order Pursuant to 18 U.S.C. 2703(d)*, the government

obtained an order pursuant to § 2703(d) of the Stored Communications Act directing the social

media service Twitter to provide information about supporters and associates of WikiLeaks,

including Jacob Appelbaum. 830 F. Supp. 2d 114 (E.D. Va. 2011). Specifically, the order

covered subscriber names, mailing addresses, e-mail addresses, connection records, length of

service records, telephone numbers or network addresses, bank account records, "records of user

activity for any connections made to or from the Account," "non-content information associated

with the contents of any communication," and "correspondence and notes of records related to

the account(s)." *Id.* at 121. The Twitter subscribers, including Jacob Appelbaum, sought to

vacate the order and to unseal all documents related to the order and to other § 2703(d) orders

issued to companies other than Twitter. *Id.* at 122. The magistrate judge granted only the motion

to unseal litigation documents related to the Twitter Order. *Id.* Although the subscribers

unsuccessfully challenged the magistrate judge's ruling before the district court and the Fourth

Circuit, *see United States v. Appelbaum*, 707 F.3d 283 (4th Cir. 2013), they did succeed in

revealing important details about the extent of the information obtained from Twitter on

WikiLeaks supporters and associates.

      More importantly, in 2011 David House filed suit against several government agencies

for constitutional violations arising from the events described in EPIC's FOIA requests—namely,

his detention and questioning at the U.S. border, and the prolonged seizure of his electronic

devices. *See House v. Napolitano*, No. 11-10852, 2012 WL 1038816, 2012 U.S. Dist. Lexis

42297 (D. Mass. Mar. 28, 2012). This case is particularly important because it concerns, in part,

violations of the First Amendment resulting from the targeting of David House. Mr. House's

complaint states that although his work "consist[s] solely of lawful and constitutionally-protected

advocacy and associational activity, [Mr. House] has been targeted for surveillance and investigation by various agencies of the U.S. government."  Complaint ¶ 14, *House*, No. 11-10852, 2012 WL 1038816 (citing questioning by "investigators for the U.S. Department of Defense, the Department of State, and the Federal Bureau of Investigation."). Mr. House alleged violations of the First Amendment and "the right of associational privacy guaranteed by the First Amendment." *Id.* ¶¶ 37, 38.

The court found that Mr. House had stated a claim for violation of his right to freedom of association under the First Amendment. *House*, 2012 U.S. Dist. Lexis 42297, 32-43. Central to the court's conclusion was the fact that Mr. House was targeted on the basis of lawful, constitutionally protected activities:

> When the agents questioned House, they did not ask him any questions related to border control, customs, trade, immigration, or terrorism and did not suggest that House had broken the law or that his computer may contain illegal material or contraband. Rather, their questions focused solely on his association with Manning, his work for the Support Network, whether he had any connections to WikiLeaks, and whether he had contact with anyone from WikiLeaks during his trip to Mexico. Thus, the complaint alleges that House was not randomly stopped at the border; it alleges that he was stopped and questioned solely to examine the contents of his laptop that contained expressive material and investigate his association with the Support Network and Manning. Although the Defendants' motivation to search and retain House's devices for their material concerning the Support Network and Manning, as alleged in the complaint, is not relevant to the Court's analysis of his Fourth Amendment claim, it is pertinent to House's First Amendment claim.

*Id.* at 33-34 (internal citations omitted).

These events, also described in EPIC's FOIA requests and opposition, provide support for the first subset of records. Admittedly, EPIC would like to describe the contents of the records in greater detail, but the government has withheld every responsive document in its entirety, all information about the volume of responsive records, any indication of the part(s) of EPIC's FOIA requests to which the responsive records may or may not relate, and true *Vaughn* indices that list

the specific documents withheld and the reason for such withholding. *See* Pl.'s Opp'n/Cross-Mot. Summ. J., Dkt. 15, at 6-8. The sparse description the government has provided is perfectly consistent with EPIC's views on the existence of the first subset of records. For example, the FBI's description of the types of documents withheld under Exemption 7(A) includes "Electronic Communication," "FBI Letter," "FD-302 (Interview Form)," "FD-542 (Investigative Accomplishment Form)," "FD-794 (Payment Request)," "Memorandum," "E-mails," "Letterhead Memorandum," "FBI Records Checks," "FBI Investigative Reports," "FBI Computer Printouts," "FBI Investigative Inserts," "Other Investigative Documents," and "Miscellaneous Administrative Documents." Hardy Decl., Dkt. 12-2, ¶ 26(a)-(n).

The government argues that such categories "describe[] the types of information in each category, and the harms that would result from disclosure of the category." Defs.' Reply/Opp'n., Dkt. 21, at 12. But the categories provide no indication of what categories contain records from the first subset: targeting of individuals who engaged in First Amendment-protected activity regarding WikiLeaks. The government might possess "FBI Investigative Reports," "E-mails," or "Other Investigative Documents," about the surveillance of individuals, such as David House, that EPIC considers to be in the first subset of nonexempt records. But the agency might also possess the same types of documents related to culpable individuals that EPIC has no interest in obtaining. Because the nature of the record and the likelihood of investigative harm depend on which subset of records are at issue, the government's vagueness on this crucial point defeats any attempt to "trace a rational link between the nature of the document and the alleged likely interference." *Bevis v. Dep't of State*, 801 F.2d 1386, 1389 (D.C. Cir. 1986) (internal quotation marks omitted).

The government cites a three-sentence footnote in the Hardy declaration stating that

"[t]he FBI is not investigating individuals who simply support or have an interest in WikiLeaks[,]" and denying the maintenance of "lists of individuals who have demonstrated support for or interest in WikiLeaks." Hardy Decl., Dkt. 12-2, ¶ 19 n.3. Note that neither the Criminal Division nor the National Security Division even attempt to make similar statements. Furthermore, the absence of "lists" or current FBI investigations about individuals who "simply support" WikiLeaks is far from the denial the government imagines it to be. The investigations might have concluded, or the FBI might have an unduly narrow conception of "simply support," or the agency might possess records from other agencies.

> **B.** **Records About Lawful, First Amendment-Protected Activities were Compiled for Improper Law Enforcement Purposes**

As EPIC explained in its opening brief, the targeting of individuals for engaging in lawful activities that enjoy the full support of the First Amendment is not a proper "law enforcement purpose" under Exemption 7. As an initial matter, it should be obvious that EPIC's argument concerns the textual meaning of a FOIA exemption and not, as the government contends, a "disagreement with the Government's enforcement priorities." Defs.' Reply/Opp'n., Dkt. 21, at 1. The purpose of Exemption 7 is to protect the government's proper investigations and court cases, *see Maydak v. United States Dep't of Justice*, 218 F.3d 760, 762 (D.C. Cir. 2000), not to shield improper or illegal activities. *See* 120 Cong. Rec. 17,038 (1974) (statement of Sen. Weicker), (An effective FOIA might have prevented "many of the abuses which we place under the heading of Watergate"). To that end, Exemption 7 requires the existence of "an objectively reasonable law enforcement purpose." *Keys v. U.S. Dept. of Justice*, 830 F.2d 337, 341 (D.C. Cir. 1987); *Shaw v. FBI*, 749 F.2d 58, 63 (D.C. Cir. 1984) ("Obviously, the mere existence of a plausible criminal investigatory reason to investigate would not protect the files of an inquiry explicitly conducted, for example, for purposes of harassment."); *Rosenfeld v. U.S. Dept. of*

*Justice*, 57 F.3d 803, 808 (9th Cir. 1995) ("The court need not accept the government's claim that a previous investigation had a law enforcement purpose if the asserted purpose is 'pretextual or wholly unbelievable.'") (quoting *Pratt v. Webster*, 673 F.2d 408, 421 (D.C. Cir. 1982)).

Here, the first subset of records consists of documents compiled from the surveillance or targeting of individuals engaged in constitutionally protected activities regarding WikiLeaks. The purpose for targeting those individuals was the exercise of their First Amendment rights, such as the creation of a support group in the case of David House. Investigations conducted because of First Amendment activity, rather than potential criminal activity, fail to satisfy the threshold requirement of Exemption 7. Thus, the records described above must be released.

The government responds that the cases EPIC cites for the necessity of an objectively reasonable law enforcement purpose "have no application here." Defs.' Reply/Opp'n., Dkt. 21, at 8. In fact, these cases indicate support the importance of a purpose-based distinction, where targeting potential criminals represents a proper purpose but targeting law-abiding individuals exercising their First Amendment rights does not. In *Lesar v. U.S. Dept. of Justice*, for example, the court discussed sets of documents compiled for two different purposes. 636 F.2d 472 (D.C. Cir. 1980). One set consisted of two Civil Rights Division memoranda and three appendices to a report compiled to "ascertain whether the FBI was involved directly or indirectly in the assassination of Dr. King and to assess the substance of the claim that the FBI had conducted an extensive operation to harass Dr. King." *Id.* at 475. The second set, which was not at issue in the case, consisted of the underlying records regarding the original surveillance of Dr. King. *Id.* at 486-87. The court held that the first set of records were compiled for a proper purpose: "ascertaining whether the FBI's activities regarding Dr. King were improper or illegal." *Id.* at 487. As to the second set, the court, while declining to rule on the legitimacy of the underlying

purpose, expressed serious reservations:

> If the documents in dispute were the actual FBI records relating to the Bureau's surveillance of Dr. King, we would have serious doubts whether these could be construed in their entirety as "investigatory records compiled for law enforcement purposes." Although the original purpose behind the FBI's investigation of Dr. King appears to have been legitimate and undertaken in good faith, the available evidence indicates that at some point this investigation wrongly strayed beyond its initial lawful scope and took on the nature of a campaign to harass and attempt to discredit Dr. King.

*Id.* at 486-87.

Similarly, in *Pratt v. Webster*, 673 F.2d 408, 422-23 (D.C. Cir. 1982), the D.C. Circuit considered a subset of documents related to the plaintiff from the FBI's Counter-Intelligence Program (COINTELPRO), which "included the use of questionable, and at times illegal, methods." *Id.* at 422. Only because the purpose at issue was to "[p]revent violence on the part of black nationalist groups," *id.*, and because Pratt had been identified as "a possible bomb suspect," *id.* at 423, did the court hold that a proper law enforcement purpose existed for documents about the surveillance of the plaintiff. The court placed special emphasis on the narrowness of the set of COINTELPRO documents for which it found a permissible purpose: "We do not intimate that all COINTELPRO documents would pass the Exemption 7 threshold, or even that all COINTELPRO documents concerning the Black Panther Party would necessarily meet this test. Those issues simply are not before us." *Id.* at 423 n.36.

The government points to *Lamont v. DOJ*, 475 F. Supp. 761 (S.D.N.Y. 1979), where the court considered 30 years of surveillance and found a proper purpose only for the first 13, as "particularly instructive." Defs.' Reply/Opp'n., Dkt. 21, at 8. Indeed, the case is instructive, for the targeting of Lamont became illegitimate once it was conducted on the basis of his constitutionally protected associations and viewpoints. *Lamont*, 475 F. Supp. at 774-75 (noting that plaintiff Lamont was targeted "only because of his association with various educational and

political organizations which enforcement authorities suspected were Communist fronts," and that "the information collected by the FBI after 1955 related primarily to Lamont's speeches, publications, and public activities."). Here, a similar situation exists as to the first subset of records.

The government claims that a proper purpose exists because "the Government had initiated a criminal investigation into the unauthorized release of classified information." Defs.' Reply/Opp'n., Dkt. 21, at 9. But this misses the point: EPIC has already recognized that a proper purpose exists as to a portion of the documents, referred to in this reply as the second and third subsets of records. It is the *first subset of records*, those compiled on the basis of the constitutionally protected activity of their targets, to which no proper law enforcement purpose applies. The government does not assert that a proper purpose exists for such activity, and indeed it cannot.

Finally, the government asserts that "EPIC flippantly dismisses the concerns underlying the investigation." Defs.' Reply/Opp'n., Dkt. 21, at 9. But, as above, EPIC's argument as to the absence of discernible harm applies only to the first subset of records. Exemption 7(A) requires either a "presently pending enforcement proceeding" or a likelihood that the "investigation is likely to lead to such proceedings." *Ctr. for Nat'l Sec. Studies v. Dep't of Justice*, 331 F.3d 918, 926 (D.C. Cir. 2003); *North v. Walsh*, 881 F.2d 1088, 1097 (D.C. Cir. 1989) (The government must "show that disclosure of those documents would, in some particular, discernible way, disrupt, impede, or otherwise harm the enforcement proceeding."). Individuals identified in the first subset of records have no criminal activity to conceal and face no prospect of prosecution. Similarly, the government's argument that disclosure would identify witnesses, cooperating individuals, and persons of (proper) investigative interest related to the prosecution of Bradley

Manning applies to records within the third subset, for which the solution is redaction. *See infra* Part II.B.

## II. The Third Subset of Responsive Records Contains Documents that Must be Released

### A. Publicly Revealed Information Regarding the Targeting of Twitter Subscribers Must be Disclosed

As described above, certain details of the government's investigation have been officially revealed. Several court cases have discussed the collection of information from Twitter. *See In re U.S.,* 830 F. Supp. 2d 114; *United States v. Appelbaum*, 707 F.3d 283 (4th Cir. 2013). These cases have revealed the contents of the 2703(d) order directed to Twitter, and the scope of the information collected. *See In re U.S.*, 830 F. Supp. 2d, at 121-22 (seeking subscriber names, mailing addresses, e-mail addresses, connection records, length of service records, telephone numbers or network addresses, bank account records, "records of user activity for any connections made to or from the Account," "non-content information associated with the contents of any communication," and "correspondence and notes of records related to the account(s)."). The existence of these cases, combined with the text of EPIC's FOIA requests and the government's response, creates a strong inference that this information is contained within the records withheld. Even assuming that such records were compiled pursuant to a proper law enforcement purpose, they have already been publicly revealed and must be disclosed.

The government may not withhold information under Exemption 1 that has already been officially acknowledged. *See Wolf v. CIA*, 473 F.3d 370, 378 (D.C. Cir. 2007). Disclosure in court is sufficient to constitute official acknowledgement. *See Cottone v. Reno*, 193 F.3d 550 (D.C. Cir. 1999) (disclosure of wiretapped recordings was warranted because they had entered the public domain when played in court and received into evidence in the requester's criminal

trial); *Cooper v. Internal Revenue Service*, 450 F. Supp. 752 (D.D.C. 1977) (waiver

accomplished by releasing document to a court as an evidentiary exhibit). Here, the government

has already consented to the release of the contents of the Twitter Order. *See In re U.S.*, 830 F.

Supp. 2d, at 122 ("On January 5, 2011, upon motion by Twitter and consent by the government,

Magistrate Judge Buchanan unsealed the Twitter Order, finding that it was in the best interest of

the investigation and authorizing Twitter to disclose the Twitter Order to its subscribers."). Thus,

the information may not be withheld under Exemption 1.

Additionally, releasing the publicly disclosed information contained in the Twitter Order

cases would not cause the harms contemplated under Exemptions 1, 7(A) and 7(E). The

government's reply claims that harm would result from exposing "targets of the investigation,"

"intelligence-gathering methods," Defs.' Reply/Opp'n., Dkt. 21, at 15, the "scope and methods of

the investigation," and "subjects and other persons of investigative interest." *Id.* at 10. Similarly,

the government relies on 7(E) to avoid revealing "*how* the techniques and procedures have been

used, including the circumstances of their use." *Id.* at 21. But these arguments are simply

inapplicable to information that has already been publicly revealed. *See Wash. Post v. Dep't of

Def.*, 766 F. Supp. 1, 12-13 (D.D.C. 1991) (once a plaintiff "point[s] to specific information in

the public domain that appears to duplicate that being withheld," the agency then "bear[s] the

burden of comparing the proffered information with the information being withheld, determining

whether the information is identical, and, if it is not, determining whether release of the perhaps

only slightly different information being withheld would harm the national security" (internal

quotation marks omitted)). Because information surrounding the Twitter Order is public, its

release through FOIA will cause no further harm.

**B.     The Government Has Failed to Segregate and Release Non-Exempt Portions of Records**

Although the third subset of records may have been compiled for a proper law enforcement purpose, the government still bears the burden of "provid[ing] a detailed justification for [their] non-segregability." *Johnson v. Exec. Office for U.S. Attorneys*, 310 F.3d 771, 776 (D.C. Cir. 2002) (internal quotation marks omitted). Providing an adequate segregability justification entails "a statement of [the government's] reasons," and a "descri[ption of] what proportion of the information in a document is non-exempt and how that material is dispersed throughout the document." *Mead Data Cent., Inc. v. Dep't of Air Force*, 566 F.2d 242, 261 (D.C. Cir. 1977).

At numerous points throughout its briefs, the government cites concerns that could be remedied through segregability. Many of these concerns arise from the potential revelation of the identities of certain individuals. *See* Defs.' Reply/Opp'n., Dkt. 21, at 10 (relying on Exemption 7(A) to withhold the identities of "potential witnesses and other individuals who have cooperated with the investigation," and "subjects and other persons of investigative interest."); *id.* at 15 (relying on Exemption 1 to withhold "the identities of specific targets of the investigation"); *id.* at 18-49 (relying on Exemption 6 to withhold "the identities of law enforcement personnel involved in the investigation, individuals who have provided information to the Government as part of the investigation, and individuals who are considered to be persons of investigative interest."). But identifying information, such as names, is routinely redacted in FOIA cases. *See, e.g.*, *Skinner v. U.S. Dep't of Justice*, 806 F. Supp. 2d 105, 113 (D.D.C. 2011) (redacting the names of third parties and releasing all segregable information to plaintiff); *Schoenman v. FBI*, 573 F. Supp. 2d 119, 152 (D.D.C. 2008) ("Instead, for documents P143, P319, P323, and P334, the State Department has withheld only the names that it asserts are covered by FOIA

Exemptions 6 and 7(C).").

The government has failed to explain why a similar approach would be unsuccessful here. Instead, the government simply asserts that "Exemption 7(A) applies to all responsive documents in their entirely; because there is no segregable information unprotected by that exemption, there is no need for a separate segregability analysis with respect to each additional exemption." Defs.' Reply/Opp'n., Dkt. 21, at 14. This is a conclusion, not a detailed justification. "[U]nless the segregability provision of the FOIA is to be nothing more than a precatory precept, agencies must be required to provide the reasons behind their conclusions in order that they may be challenged by FOIA plaintiffs and reviewed by the courts." *Mead Data Cent., Inc.*, 566 F.2d at 261. The government's analysis is plainly devoid of reasoning. Moreover, the mere invocation of Exemption 7(A) accomplishes nothing, as "[t]he 'segregability' requirement applies to all documents and all exemptions in the FOIA." *Ctr. for Auto Safety v. Envtl. Prot. Agency*, 731 F.2d 16, 21 (D.C. Cir. 1984).

Similarly, the government has failed to adequately explain why factual material cannot be segregated and released from deliberative documents being withheld under Exemption 5. The government claims that "agencies may withhold factual material contained in a deliberative document when the document's author has selectively chosen certain facts, such that disclosure would highlight facts that the author deemed significant or noteworthy." Defs.' Reply/Opp'n., Dkt. 21, at 18. But every fact in a deliberative document exists because the author deemed it important enough to include. The government needs to establish that the factual material is "so inextricably intertwined with the deliberative sections of documents that its disclosure would inevitably reveal the government's deliberations." *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997). Even if portions of documents contain "opinions by agency staff that are

predecisional and deliberative in nature," factual material must still be segregated unless it is "inextricably intertwined with deliberative notes." *Williams & Connolly LLP v. SEC*, 729 F.Supp.2d 202, 213 (D.D.C. 2010). *See also Pub. Employees for Envtl. Responsibility v. EPA*, 2013 WL 753437, *9 (D.D.C. 2013) (finding introduction, methodology, and documents reviewed sections of an otherwise protected report to be segregable factual material). Here, however, the government's declarations "simply parrot the legal standard" instead of providing "a more nuanced explanation as to why the information is inextricable from deliberative material." *Judicial Watch, Inc. v. DHS*, 841, F.Supp.2d 142, 161 (D.D.C. 2012); *see* Hardy Decl., Dkt. 12-2, ¶¶ 86,87 (restating the definitions of predecisional and deliberative); Bradley Decl., Dkt. 12-3, ¶ 26 (restating the definitions of predecisional and deliberative in the context of an email, but failing to address segregability); Cunningham Decl., Dkt. 12-4, ¶ 29 (failing to address segregability).

### III. The Government Conducted an Inadequate Search for Responsive Records

Both NSD and FBI failed to conduct adequate searches. NSD states that it simply "determined which component(s) within NSD would be likely to possess responsive records," and that any documents not in the lead attorney's electronic files would be "duplicative." Bradley Decl., Dkt. 12- 3, at ¶ 9. Crucial details regarding NSD's search are excluded with the conclusory justification that revealing them would "compromise the investigation." Defs.' Mot. Summ. J., Dkt. 12, at 8. In contrast, the FBI was apparently capable of providing a more detailed description of the design of its search without compromising its investigation into the same crime. But the FBI's search fails because it uses only a single search term, "WikiLeaks," and ignores other terms that made obvious by the text of the FOIA request, explicitly suggested by EPIC, and actually used by another component of the Department of Justice.

The government argues that NSD has explained the "basis for the search's design," Defs.' Reply/Opp'n., Dkt. 21, at 2, and cites *Weisberg v. DOJ*, 627 F.2d 365 (D.C. Cir. 1980), in support of its claim. However, *Weisberg* instructed that a search "provide information specific enough to enable [Plaintiff] to challenge the procedures utilized." *Id.* at 371. By withholding the explanation behind the assertions that other documents would be duplicative and that additional detail would "compromise the investigation," the government has prevented EPIC from adequately challenging those procedures. Thus, the description is inadequate.

The government next argues that the FBI's "obligation is not to conduct a search as designed by the requester." Defs.' Reply/Opp'n., Dkt. 21, at 3. Although this is true, it is the FBI's obligation to "follow through on obvious leads to discover requested documents." *Campbell v. DOJ*, 164 F.3d 20, 28 (D.C. Cir. 1998). Given EPIC's suggested terms and the comparative breadth of the terms employed by CRM, the FBI's insistence on using a single term "raise serious doubts as to the completeness of the search." *Perry v. Block*, 684 F.2d 121, 127 (D.C. Cir. 1982); *See* Cunningham Decl., Dkt. 12-4, ¶ 10 (explaining that CRM search used the terms "WikiLeaks"; "surveillance"; "social media"; "Facebook"; "Google"; "Twitter"; "Private Bradley Manning"; "Julian Assange"; "Jacob Appelbaum"; "David House"; "Rop Gonggrijp"; and "Birgitta Jonsdottir"). Accordingly, the search was inadequate.

## IV. The Court Should Conduct an *In Camera* Review to Resolve Substantial Questions Regarding the Content of the Withheld Records

The FOIA contemplates the use of *in camera* review as a mechanism for assisting courts in resolving claimed exemptions. A court may review documents *in camera* when it needs to "supplement" the agency's public explanations, *Roth v. Dep't of Justice*, 642 F.3d 1161, 1185 (D.C. Cir. 2011), or "on the basis of an uneasiness [on the part of the trial judge], on a doubt he wants satisfied before he takes responsibility for a *de novo* determination." *Ray v. Turner*, 587

F.2d 1187, 1191 (D.C. Cir. 1978). *In camera* review is appropriate in this case because a substantial portion of the dispute turns on the contents of the withheld records. Furthermore, because virtually all useful information concerning the responsive records has been withheld from EPIC, *see* Pl.'s Opp'n/Cross-Mot. Summ. J., Dkt. 15, at 27, *in camera* inspection would "increase[] the 'adversariness' of the proceeding or at least provides a minimal substitute for true 'adversariness' by allowing the court to test the accuracy of the agency's representations. *Ray*, 587 F.2d at 1212 (Wright, concurring).

The government makes two principal arguments in response. First, it argues that "*in camera* review over-burdens judicial resources, by requiring the review of potentially large volumes of responsive materials." Defs.' Reply/Opp'n., Dkt. 21, at 23. But the burden on judicial resources depends on the total volume of material, which the government has refused to provide. Even assuming a large volume of records, the Court may remedy the problem by reviewing only a sample of the responsive material. *See, e.g., Weisberg v. U.S. Dep't of Justice*, 745 F.2d 1476, 1490 (D.C. Cir. 1984) (random sampling); *Bonner v. Dep't of State*, 928 F.2d 1148, 1151 (D.C. Cir. 1991) (representative sampling).

Second, the government contends that this case does not present exceptional circumstances because the good faith of the agencies is not in question and the contents of the withheld documents are always in dispute in FOIA cases. Defs.' Reply/Opp'n., Dkt. 21, at 23. The D.C. Circuit has made clear, however, that "*[i]n camera* inspection does not depend on a finding or even a tentative finding of bad faith." *Ray*, 587 F.2d at 1195. And the extent of the dispute as to the contents of the documents is far deeper than the government admits. As explained above, EPIC believes that the responsive records may be grouped into three general subsets, the first of which involves the targeting of individuals for exercising their First

Amendment rights. The government claims that there is no support for the existence of such a subset of records, but does not clearly deny its existence. In this situation, *in camera* review is appropriate. *See Quinon v. FBI*, 86 F.3d 1222, 1228 (D.C. Cir. 1996) ("Finally, when the dispute turns on the contents of the withheld documents, and not the parties' interpretations of those documents, in camera review may be more appropriate."). Accordingly, the Court should conduct an *in camera* inspection of the records.

## CONCLUSION

For the foregoing reasons, the Court should deny the government's motion for summary judgment and grant Plaintiffs' cross-motion for summary judgment. At a minimum, the Court should conduct an *in camera* inspection of the records in order to satisfy its statutory obligation to conduct a *de novo* review of the government's withholdings.

Respectfully submitted,

By:     _/s/_____
        Marc Rotenberg (DC Bar # 422825)
        Ginger McCall (DC Bar # 1001104)
        David Jacobs[*]
        ELECTRONIC PRIVACY
        INFORMATION CENTER
        1718 Connecticut Avenue, N.W.
        Suite 200
        Washington, D.C. 20009
        (202) 483-1140 (telephone)
        (202) 483-1248 (facsimile)

Dated:  April 24, 2013

---

[*] Mr. Jacobs is a member in good standing of the New York bar whose admission to the D.C. bar is pending.